are still setting up. Isis Benjamin, Fantasia Horton et al. v. Commissioner, Georgia Department of Corrections, Assistant Commissioner, Georgia Department of Corrections et al. 25-14263. And Mr. Thompson, when you're ready, you may proceed. And I do see that you have reserved some time for rebuttal. Thank you, Your Honor. Before I get started, I'd like to inform the panel that Michael Bentley, who represents the Centurion Appellants, is with me at council table in the event the panel has any questions specific to that set of defendant appellants. May it please the Court. The Eighth Amendment does not compel Georgia to fund and facilitate controversial and unproven medical interventions in its prisons, nor does it transfer regulatory authority over such treatments to plaintiff's experts. But that is the world the district court imposed. Under Scrimeti and Eknis Tucker, Georgia can cross-sex hormone treatments outside of prison, but once an individual is convicted and sentenced, he earns a constitutional right to the very same treatment, so long as his lawyers find an expert willing to endorse the WPATH standards. Our Constitution does not mandate that outcome. States enjoy at least as much deference in areas of medical uncertainty under the Eighth Amendment as they do when drawing medical use classifications under the Fourteenth, and when a state reasonably limits the universe of permissible treatments for a condition. A prison's provision of those treatments does not constitute cruel and unusual punishment. The district court held otherwise only by ignoring the legislature's rational judgment, accepting plaintiff's experts at face value, and refusing to acknowledge contrary evidence. Perhaps a decade ago, that approach, while wrong, would have been understandable. But in a post-Scrimeti world, we've learned just how unreliable the expert medical consensus really is. Georgia had every right to respond to that profound erosion of trust with this common-sense legislation. I welcome the Court's questions. So one of the issues that has been extensively briefed and certainly was addressed by the district court is whether or not it is proper for the district court and then for us to consider the expert reports that you have at least referenced in argument and briefing below. The district court and opposing counsel is arguing, you know, the district court couldn't consider those. They weren't admitted into evidence. What's your best argument for why we can look at these reports, which, as I understand it, you are offering up simply to show this is just a difference of medical opinion. There is no scientific medical consensus on the administration of hormones to people who attest that they are transgender. Sure. Happy to respond to that. I have a couple, kind of, two sets of answers. One is kind of case-specific, what happened here, and another is a kind of a higher-level doctrinal point. So first on this case, these studies were unquestionably part of the PI record. We quoted them in our briefs. Counsel for both parties debated them at the PI hearing and the district court addressed them. So let me see if I can short-circuit because I think we're going to have a lot of questions. Let's assume, for the sake of argument, and I'm not passing judgment on this, that we say they weren't admitted below. So can we move on to sort of the doctrinal issue because there are a lot of cases that have come before you where reports have been referenced, and I'm wondering if we can do the same thing. Right. So, obviously, disagree with the premise, but I'll accept the premise for purpose of this answer. And you may get questions on disputing that preference, but just for my purposes of my question. So I think this goes to a fundamental— You're not disputing that the district court didn't admit them, saying it was too late under the order. The district court didn't admit the reports as exhibits. I'm not disputing that, Your Honor. I'm disputing whether they were covered by the stipulation, but to, if I could, to get to— I just want you to put that aside. Understood, yes. So I think this gets to a fundamental disagreement in the case about the interaction between SB 185 and the Eighth Amendment questions here. My friend's view on the other side is that we have to set that statute aside completely and hermetically seal off the question about whether the legislature did something rational here when it defined the universe of acceptable treatments from whether these plaintiffs experienced cruel and unusual punishment at the hands of prison officials. And I don't think those two things can be sealed off one another, and I'd like to unpack that if I can. So if a state has rationally selected the universe of treatments that are available for a certain condition, then we know a few things. The first thing we know is that if that decision is rational, which the reports we submitted prove up, then the treatment pursuant to those rational terms is not going to be objectively conscience shocking and intolerable as described in— So my question may be a little more narrow, and I'm just trying to get at can we look at the, if we agree with the district court ruling that these, and the district court was right, you didn't, they're not admitted, she didn't look at them, we shouldn't either. Right. I'm getting at the we shouldn't either part. Can we look at the reports? You absolutely can for the same reason that this court and Agnes Tucker and the Supreme Court and Spermenti were able to look at some of the same materials, and that is because the legislative judgment that these treatments, these more invasive treatments should be set aside and instead we should focus on the less invasive treatments is a rational one, and the legislature has wide discretion to make that judgment in reliance on evidence that the medical debate is uncertain, that there is a lack of evidentiary support for the treatments. So once you take that into account, and I think the studies can certainly be considered for that purpose, the other side's view of the case is that with this stipulation we just pulled the plug on our whole litigation because this statute was irrelevant to the analysis, and the statute can't be irrelevant to the analysis because medical treatment is always a dialogue between individual considerations and the law, whether that's the law of medical malpractice, our state regulatory boards, our regulations, whether it's sometimes, rarely, but not never, categorical legislative judgments about whether a particular treatment should be allowed. So all of that, and once we, if the a rational legislative judgment under Scrimeti and Agnes Tucker, and you can certainly consider the studies for that, it simply follows as a matter of logic and case law that treatments that are provided in accordance with a rational legislative scheme are not super-added pain. Two questions about the statute. One is, in Scrimeti, the court looked at the Tennessee SB 185? We don't, Your Honor. So yes, that is a distinction between this case and Scrimeti. I could try to explain why I don't think it makes a difference here. Sure. First is that the applicability, the key takeaway from Scrimeti is that rational basis is the constitutional standard that applies to medical use classifications. The applicability of that deferential standard certainly does not turn on the existence of the findings. Certainly, to paraphrase Dobbs, where you have detailed and active findings, it makes it especially easy for the court to know which, quote, legitimate state interest the legislature thought it was serving. But the ultimate question when reviewing a law like this one is still whether it bears a rational connection to such an interest. So the existence of the debate that the studies point up is dispositive, even if the legislature... I think there's a debate, frankly, on a lot of medical issues that there wasn't a debate about even until recently. So how far would we take that? I know you're positing that these studies, these papers show that there's a real debate on this particular issue. But how do we as a court kind of evaluate and judge what might be a real debate if we don't know necessarily what the these studies, you know, maybe the stipulation covers them, but if they're completely out, then how are we to know, you know, we have to extend whatever we do on this case to other cases. How are we to be able to judge the same question if the legislature makes a different determination? So I think the debate label can be a little misleading. It's not that the state legislature has to wait until there's like a sufficient circuit split among medical experts before it can decide what it wants to say. The question simply is whether this state legislature could be rationally pursuing legitimate state interests. And the existence of medical uncertainty, a question about the evidentiary base justifying certain treatments, has always been considered enough for a state legislature to reasonably intervene in the practice of medicine. And the, I mean, the fact that this, that a very important review came out while we were briefing this case in the Zhang review that goes through and describes just how... What review are you talking about? So this is not on the record. I'm talking about the Zhang review. And it's not in the record and you want to talk about it? Well, I'm just pointing out that... That's the whole problem in this case is that did you put in any evidence in the district court? What evidence did you put in the state of Georgia? So we put in the affidavits from the statewide medical director and the treating physicians regarding which care is available and being offered to inmates with gender dysphoria. All right. Did you put in any evidence about whether or not hormone therapy treatment was medical, medically necessary and not? You put no evidence about that. So... Is that correct? We did not put in a statement adopting that legal conclusion of medical necessity. We put in evidence of what the treatments are and it's a question of law for the court to determine whether those treatments... No, no. Just take it... Assume that it does matter whether it's medically necessary and not as to whether or not you have to provide the treatment. So you put in no evidence saying that this treatment was not medically necessary as I understand the record. Is that correct? I believe that is correct, Judge. Okay. And I can try to explain why we don't think that's dispositive here. And so all you did is put in evidence of what the policy was and what treatment the plaintiffs had gotten or had not gotten. So why didn't you, if it's so controversial and so many people think this is not necessary, why didn't you put in an affidavit creating an issue of fact on that issue? Instead of basically coming here and having to concede it's medically necessary. So I'm certainly not conceding that it is medically necessary in the sense relevant to the 8th Amendment, which is conscious, shocking, intolerable, amounting tantamount to torturing. That's not medically necessary. That's the 8th Amendment. I'm just talking about medical necessity. It is a legal question whether or not providing something that's medically necessary shocks the conscience. Okay. For example, you could be dying and they say, we give you no treatment even though it's medically necessary. That shocks the conscience. That's a different issue. But we have to first decide whether the record before us says this is medically necessary to effective treatment because the states put in no evidence otherwise. That's what I'm concerned with. Your Honor, I understand your concerns. I like to make two quick points. But isn't that where we are? That we have to decide this shocks the conscience, even though the undisputed record here is that it's medically necessary. Your Honor, I have a couple of points I'd like to make in response to that. The first one is that if the constitutional standard reduces to medical necessity and if medical necessity reduces to below the standard of care. I'm not saying it's unconstitutional. I'm asking that we have to decide the constitutional question of unconscionability shocks the conscience really bad on a record that says the treatment is medically necessary. Isn't that where we are? So our position is that it is not sufficient for an Eighth Amendment claim to have a record on which a plaintiff expert's opinion of medical necessity is undisputed. That model of the Eighth Amendment reduces to medical malpractice for prisoners. And the Supreme Court and this court constantly say that's not what we have. If we have to take those disclaimers seriously, then we can't adopt that model of Eighth Amendment litigation. And then also that completely ignores that we have a statute here. I admit this is a somewhat unusual Eighth Amendment case in that we had the legislature coming over the top with a rational categorical rule. Why didn't y'all just get a doctor to file an affidavit on your view of this treatment? Your Honor. I'm totally perplexed about that. So frankly we don't think we need to do that when we the state commits to this battle of experts in the Eighth Amendment litigation. It's not free and it is a burden on federalism. It's a burden on our interests. And when the legislature comes in and says we're resolving this, if that legislative decision is irrational, if it would flunk rational basis review, maybe we'd have a different case. But if that legislative decision about here's the universe of acceptable treatments, treatments provided in accordance with a rational legislative choice are a reasonable response to the risk under Wade, under McClinton, in this Court's other cases. And didn't we, wasn't there a similar situation in Gibson v. Collier coming out of the Fifth Circuit? The Court pointed out that there was a sparse record before the Court that only included the WPATH standards of care. But then the Court pivoted to look at a more fully considering, I think, at least the CAST review. Is that right? So I think it was before those reviews. Okay, but it was looking at what the First Circuit had done as far as... I think Gibson is particularly relevant here in that this kind of goes to some of the questions I've gotten this morning. The Fifth Circuit and Gibson explained that policymakers get a vote in the question about what is a, it used the term, universally accepted treatment. It used an example of the FDA declining to approve a certain treatment and basically saying we're not going to let this drug go on the market. I think the upshot on my friend's theory is that you happen to be a prisoner. You have the right, at the very least, to an individualized assessment by having a doctor come in and say, I know that drug's not on the market yet, but I've looked at the studies and it is medically necessary that my client receive it. Their view is the law is hermetically sealed off from questions of medical judgment. Okay, the Fifth Circuit case is about sex reassignment surgery. It's not about hormone treatment, right? That is absolutely correct. And Texas was providing hormone treatment. Sure. Yes, so the Fifth Circuit case is about whether you got to go have surgery, not hormone treatment. I'm just trying to clarify, make sure I understood it. You are correct. Thank you. Yes, what's important... It was about what the literature out there was about sex assignment surgery, not about hormone treatment. I would point out that the Fifth Circuit said... Is that correct? Yes, Your Honor. It does not forbid categorical judgments about the necessity and efficacy of certain medical treatments. It's that principle in Gibson that we are pointing to, not the precise facts of Gibson. And I'm correct that only 126 inmates have it, and this is right. There's no cost at all. This is not a case where the cost is huge. I mean, hormone treatment... Or the state didn't claim it's a big cost. There was nothing about that. That has not been part of our case. If we were defending a straight-up... And it's 126 inmates, and I mean, maybe we can take judicial notice that you can do this for $10 a month or whatever. I mean, it is de minimis cost. We have not... You've not claimed any cost factor for rational basis. You've not claimed anything. No, no. We're looking to the rational basis review that matches up with the considerations that apply under the Eighth Amendment, which is, is this a rational set of treatments that the legislature has limited physicians to in treating this condition? That's what Skrmedie and Agnes Tucker are all about. They're saying it is rational to say this far and no further. If that is rational, a prison official... First of all, Skrmedie is about... All that's about children. This is about adults, and all those cases are imbued with the fact that this is children here, not people of majority. This case is 18-plus. None of the rationale in Skrmedie or even the case we have... Agnes Tucker. Yes, thank you very much. Yes, Your Honor. It's all about children. It's a whole other world, and they're not locked up. If I could respond to that briefly. So, that is certainly a distinction between the cases. The fact that the care was applying to children did not govern the constitutional standard that was applied. I think it made it particularly easy to apply the standard, because the fact that these treatments were being applied to children generated so much controversy and debate about their efficacy and ethics. But if you look at the studies that the Supreme Court and this Court were citing in those cases, the evidentiary problems here go deeper than just with minors. There are fundamental questions about the evidentiary base for this form of treatment. The Baker Report said the strength of medical evidence that cross-sex hormones improve patient quality of life metrics is low or insufficient, and could not draw any conclusions about whether hormone therapy affects suicidality. The Cass Report says we have no good evidence on the long-term outcomes of interventions to manage gender-related distress. So, the kids' controversy alerted everyone to look deeper here, and what the legislature was entitled to conclude from the is that actually the problems here run a lot deeper. These are problems of independence of the standards of care. They are problems of evidentiary reliability. They are, as Judge Lagoa said in her concurral in Agnes Tucker, WPAT's lodestar is ideology, not science. The problems here are not limited to kids, and the reasoning of cases like Scrimeti and Agnes Tucker are not limited to kids. Thank you.  Ms. Seals. Good morning, Your Honors, and may it please the Court. With the Court's permission, I'd like to start where Judge Brandt, your question started. Can I ask you one question just sort of out of the gate? I have been unable to locate within the record the WPATH report or standards. Is that a copy? Is there a copy in the record? There are not, and that's because we are not, I mean, our case is not predicated on what WPATH says, and the district courts, I believe the preliminary injunction order articulates this very clearly. Our expert testimony established that there is a medical need for this care, and that was based not only, you know, not exclusively on clinical guidelines, but on these clinicians' professional experience treating patients with gender dysphoria. And so you can completely exclude WPATH from your consideration and reach the same result. In fact, you should. And in fact, you can consider Cass and Baker and reach the same conclusion. Now, we think you shouldn't do that. We think you shouldn't do that because of the stipulation. We think you shouldn't do that because these are not the kinds of legislative facts that are susceptible to judicial notice, and I think this Court's decision in West Alabama Women's Center v. Williamson establishes that facts regarding the safety of medical procedures are not legislative facts and therefore not susceptible to judicial notice. Instead, they are adjudicative facts. But even if you consider Cass and Baker, the result is the same, and that's because under the Baker review, hormone treatment is unquestionably positively correlated with stability or improvement in depression, anxiety, and quality of life. At page, at R72-2 at 14, the Baker review states that hormone therapy is an essential component of care that promotes the health and well-being of transgender people. Even if you consider the Cass review, which expressly disclaims its application to adults, and I think that difference is important as Judge Hull recognized, both the science and the law are different when we're talking about children versus adults. But even if you were to consider the Cass review, which expressly disclaims its application to adults in saying that there are different issues involved in considering gender care for children and young people than adults, that's at page 27, R72-3, hormone therapy for transgender adults is nonetheless a, quote, well-established practice that has transformed the lives of many. That's at R72-3 at 183. In other words, there is no medical controversy here. The rational basis is not... I think that's a harder position to take. I mean, I think it's clearly your clients have a view about what the medical understanding is. But I think to say that there is not a medical controversy is not quite right, which leads me to the question of how do we as a court evaluate a legislature's response to changing medical evidence? And look, set this case aside. I'm not asking for any concessions about this case. I'm saying in the aggregate, we know that over time, medical consensus changes and shifts and improves. And maybe some people think, you know, gets worse, right? It's a changing body of evidence. How do we as a court evaluate the legislature's response to changes in what's considered kind of standard and obvious? I think the best starting point is the Constitution. And the whole point of the Constitution is that there are limits to a legislature's authority. There are limits to a degree that will bow to pressure in any direction when we have individual rights at stake. And so while... I mean, what's critical here, again, is the Eighth Amendment right that serves as a backstop to anything that the legislature is doing. And medical necessity, you know, deliberate indifference to medical need. This is well established under decades of Supreme Court precedent, starting with Estelle versus Gamble, is necessarily cruel and unusual. Deliberate indifference to serious medical need is necessarily conscious shocking. But isn't deliberate indifference an odd framework for this claim, though? I mean, ordinarily, it's the person standing there in front of the inmate saying no or laughing or this, right? Some really horrifying circumstances. But this is, you know, how do we... My other question is, how do we import this legislative framework into the deliberate indifference structure where it usually doesn't go? I think the answer is you simply don't, Your Honor. I mean, we would be ignoring stare decisis to substitute this equal protection, rational basis type analysis in favor of well established decades of constitutional precedent regarding the Eighth Amendment and deliberate indifference to medical need. And the question in the Eighth Amendment context, again, is whether there is deliberate indifference to serious medical need. If we're going to overlay a rational basis type analysis there, then the question is whether there is a rational basis that overcomes serious medical need. And on this record, again, there simply isn't that evidence. I would point again to the district court, the hearing before the district court, this is in the record R56 at page 35, where the state's counsel acknowledged that there was no evidence in the record of changed medical need. The Winn Declaration and the other declarations, the two declarations that defendants put in the record, the only two pieces of evidence they tendered to the district court, those established the same thing, that the change in treatment here was not based on any change in clinicians medical judgment about what these patients needed, but rather it was based entirely on the inaction of SB 185. The Eighth Amendment deliberate indifference analysis has never said if you prisoner don't receive exactly what one clinician at your prison thinks that you need, then you've shown a constitutional violation. You're correct, Your Honor, but again, that's, that's what we're, we're not talking here about one patient, and we're not talking about a good faith difference of medical opinion about one, what one patient needs. We are talking about a categorical ban on an entire category of treatment. Are you, are you suggesting that a categorical ban by a legislature would never be appropriate? What if, for example, the Georgia legislature said we are not going to permit lobotomies in prison? Would you be arguing that this has to be determined on an individual basis? We may have somebody that needs a lobotomy. No, Your Honor, I'm not. I mean, I don't think you have to reach this, this, the constitutionality of categorical bans in order to decide this case, but, but what we're talking about here is... But you're, but you're, but you're arguing for that. You're saying that there has to be individualized attention to address whether, what treatment should be given to a particular prisoner based on a serious medical need, and here the other, the argument on the other side is going to be, well, but we're, you've, you've put us into the Eighth Amendment framework in your lawsuit. We're looking to deliberate indifference. Here we may, we have a difference in medical opinions. So a few points in response, Your Honor. Again, I would say that we have not been, we have not put the court in the Eighth Amendment context, that the state of Georgia put us in the Eighth Amendment context. And you filed the lawsuit. I understand, Your Honor. And you, you picked your claims. I understand. And you, you're operating under a backdrop of Scrimeti, so that's going to take out some claims. So we're, we're, we're, we're sort of dancing with the one that brung us, and that one that brung us is you, right? I understand, Your Honor. But again, I don't think that the court has to entertain the question of whether categorical bans are constitutional. It's not new law that individual assessments that, that deliberate indifference to individual medical need or to medical need is driven by individual assessments of medical need. If we look to this court's precedent in Hoffer, for example, where we were considering a class of extraordinarily expensive hepatitis C drugs, the court, the court determined that there were some patients for whom this class of hepatitis C drugs was not minimally adequate care. It wasn't necessary. Those were patients who had a fibrosis level of zero or one. There were, however, other patients, fibrosis levels of two or three, for whom this, this category of drugs that cost upwards of $40,000 a patient was minimally adequate care for those patients. Now, derivative of that is that patients have, there has to be a clinical assessment of which level of fibrosis a patient has. Are they F0? Are they F1? Are they F2? Are they F3? And so, derivative of the right to individual, to have, to not face prison conditions that are deliberately indifferent to one's serious medical need is a, is a right to have an assessment of one's serious medical need. And the, the state here made a determination that no gender dysphoria patient can get this treatment even when it is medically necessary. The trial court record controls whether there's a controversy about medical necessity. That record included evidence that the state's own clinicians determined that for every member of the receiving class, and for other patients, that hormone therapy was medically necessary care for those patients. It was medically necessary to treat their gender dysphoria. And yet the state has withdrawn this care. Again, not because there is some change in medical circumstance for the individual patients. They've offered no evidence that the doctors were actually relying on controversy. In fact, the evidence contradicts that. Mind you, they've also offered no evidence that the state legislature was relying on this purported medical controversy. As Judge Grant questioned, there were no fact findings by the legislature. There's no evidence that this notion of medical controversy was ever before the legislature. And so. As I understand his argument, he's saying, okay, we'll accept that you have experts that say it's medically necessary. And his argument is medically necessary to address a serious medical need. They don't dispute it's a serious medical need. They don't even dispute that it's medically necessary. One, they didn't put any evidence of it that it wasn't. You have only a record that says it is medically necessary. But what they say is not every medically necessary treatment is an Eighth Amendment violation. That's kind of what I got this morning. So can you address that? He's saying, he's saying it's controversial whether it's medically necessary or not. So I don't know. Maybe that means it's disputed. It's not in this record, in my view, because we don't have any evidence otherwise, unless we take judicial notice of these reports. And I agree with you. I've read, looked at the reports. One of them says it is medically necessary. But anyway, so help me with we've got something. Let's assume for sake of argument, the state's even saying it's a medical, serious medical risk and it's medically necessary. They're saying that doesn't shock the conscious in this circumstance or arise to the level of an Eighth Amendment violation denial of that medically necessary treatment. So help me with that. Of course, Your Honor. So two things. Again, we'd come back to the to the point that deliberate indifference to serious medical need is per se conscious shocking. It is per se cruel and unusual punishment. But the other point is that we can't. I mean, the argument that that medical controversy that are purported medical controversy. I mean, again, the controversy that would have to exist here to sustain the or to sustain the defendant's argument is that there is no patient for whom this care is medically necessary, that there is that because the relief thought, again, is not that every gender dysphoria patient in Department of Corrections custody is entitled to hormone therapy constitutionally, automatically in perpetuity. The relief thought restores us to pre SB 185 circumstances where medical providers are making these decisions based on individual patient need. And so the controversy would have to be that there is no patient for whom this care is medically necessary. They certainly haven't carried that burden. But we also mean to answer wise for many, I think, cannot control here. We don't substitute, particularly in the face of familiar constitutional standards. We don't substitute equal protection analysis for decades of binding Eighth Amendment analysis. And I think Judge Newsome's concurrence in the Lang decision here is incredibly instructive because there, Judge Newsome noted that the court in Lang was refusing to substitute the title seven analysis from Bostock into the equal protection context in Lang. And it did so in part because those were different legal doctrines. They use different words. They apply to different categories of people. It's the same thing is true here. We have different constitutional doctrines. They have different words. They're arising in a different context. We can't collapse these doctrines, even when they share some conceptual real estate. And, you know, Judge Newsome noted that equal protection and title seven share conceptual real estate, but equal protection and the Eighth Amendment share even less real estate here. So we can't collapse those two. But I don't see how we can permissibly collapse them here. I mean, by defendant's logic, Scarametti and Agnes Tucker would permit the state to restrict entire categories of care without regard to other independent constitutional rights. And we know that's not the case. We know that in part because a state cannot restrict conversion therapy, for example, which is controversial care without regard to whether doing so implicates First Amendment rights. I see my time has elapsed, but if the court has any other questions, I'd be happy to answer them. Thank you, Your Honors. Mr. Thompson, you have four minutes. You're not arguing that there's not a serious medical need here, right? No, we did not dispute that. A couple of things, Your Honor. First, Judge Grant, you asked how do we account for the legislature's judgment in SB 185, and the response my colleague gave was you simply don't. Let's unpack very quickly what that means, what the upshot of that is. It means that provided pursuant to a rational legislative regime constitutional under Scarametti can nonetheless amount to the infliction of cruel and unusual punishment. That is a contradiction in terms. What the upshot of their argument is that when the Supreme Court decided Scarametti, there was tons of evidence in the record from physicians saying it is medically necessary that this minor receive cross-sex hormones. What you're saying to the Supreme Court is you sentenced those children to the super addition of pain and torment. Those two things cannot be held in the same logic next to one another. And so we're not saying that we just throw out all the Eighth Amendment standards. We're asking this Court to take the Supreme Court's and this Court's admonitions that the Eighth Amendment is not med mal for prisoners, to take them seriously. And I think you really have to take them seriously if the legislature comes in and rationally defines the set of practices that can be used to treat a condition. So you don't agree with your friend on the other side that medically necessary care is that the the lack of medically necessary care is per se an Eighth Amendment violation? I struggle with the term medically necessary because it raises it begs a couple of questions like according to who and how does it differ from the standard of care that would apply in a med mal case. If what medically necessary means is I have a medical expert who says that it is the standard of care to provide it, then the Eighth Amendment is medical malpractice for prisoners and that's the one thing that Estelle and countless opinions in the U.S. report and the federal report say is not the law. So I can't square those two things in my mind. Judge Grant, you also asked about what happens when the standard of care changes. Childs, which my friend alluded to from the Supreme Court, is a good reminder. Justice Gorsuch said in that opinion that the standard of care changes and always has, which brings up their reliance on the previous pre-SB 185 protocols. I don't blame my client, the department, for a good faith attempt to follow the science as it was understood at the time when these prisoners were coming forward and I also don't blame them for trying to avoid Eighth Amendment liability. But here's the thing, sometimes the treatment becomes part of the standard of care because it has a robust evidentiary base supporting it and sometimes the treatment becomes part of the standard of care because advocacy organizations quote their beliefs back and forth to one another until a consensus emerges. How is the standard of lawsuit, what are, what is defining the standard of care within the Georgia prison system, right? Might it look, could different doctors at different facilities have different views, like how does that in practice work? My understanding is, and these are in the record so your honors can look at them, my understanding it was a fact-intensive process of evaluating what symptoms is this person showing, you know, how serious are the concerns about whether they're going to engage in self-harm, all these things. But I want to, do want to point out that we started... Wait a minute, I think Georgia had a policy in its regulations to provide hormone treatment. They had it in the department. Yes. No, they had, the Department of Corrections had a policy that this was permissible treatment. Yes, permissible. It's in, well, when indicated based on... If somebody requested it was permissible. It was pretty free in giving it. There was nobody that asked for it that they didn't give it to before this... Right. House bill, correct? So, there was not a categorical rule, but there was a intensive, you know... Okay, everybody that asked for it, they had a regulation, DOC regulates everything. They put it out everywhere. They gave it to everybody who requested it. And, and... I don't know whether they should or should not, but that's what they did. Sure, and our point is that things can change. And what Skirmendy and Ms. Tucker say is... I don't question that, but I'm just answering your question. She asked, what were they doing and what did they say before? I do want to point out that we started doing a lot of this in response to Eighth Amendment litigation brought by some of the attorneys on the other side of this case. So, these things are interwoven in a way that is sometimes hard to disentangle. If I could, one final, one final point. My friend said that we can't take notice of these studies. I don't think I can improve on my friend's statement before the district court. On page 65 of the hearing she said, I think these documents which we cite in the briefing speak for themselves. I would commend you to just look at these, this medical literature for yourself. I don't think I can really improve on that. If there are no further questions. Thank you. Thank you both. We have the case under advisement. Thank you.